UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CRA HOLDINGS US, INC. AND SUBSIDIARIES,                    **DECISION**
                                                              **and**
                              Plaintiffs,                    **ORDER**

        v.                                                  **15-CV-239W(F)**

UNITED STATES OF AMERICA,

                              Defendant.
_____

APPEARANCES:        ZERBE FINGERET FRANK & JADAV
                    Attorneys for Plaintiffs
                    JOHN H. DIES,
                    JEFFERSON H. READ,
                    ROBERT G. WONISH, II, of Counsel
                    3009 Post Oak Boulevard, Suite 1700
                    Houston, Texas   77056

                    DAVID A. HUBBERT
                    Acting Assistant Attorney General
                    Tax Division, U.S. Department of Justice
                    Attorney for Defendant
                    JAMES M. STRANDJORD, of Counsel
                    PO Box 55
                    Ben Franklin Station
                    Washington, DC 20044


        In this R&D tax refund case based on Plaintiffs' claim that Plaintiffs, a national

environmental remediation firm, are entitled to recover $618,143 in taxes for Plaintiffs'

tax years 2002 and 2003, Plaintiffs' claim is predicted on various amounts of R&D tax

credits to which Plaintiffs allege Plaintiffs are entitled pursuant to 28 U. S. C. § 41 ("§

41") arising from Plaintiffs' Qualified Research Expenses ("QREs") incurred in

connection with 159 environmental remediation projects undertaken by Plaintiffs during

the tax years at issue.  Since the initiation of the case, the parties have disputed the

possible use of a sample of the projects (reduced by Plaintiffs to 159 from 6,100) upon

which Plaintiffs' amended refund claim is based to facilitate discovery and trial (or summary judgment) on the merits as a practical means to minimize costs of litigation and judicial time.  The court resolved that issue in its Decision and Order filed January 26, 2017, Dkt. 46 at 14-16, *CRA Holdings US, Inc. v. United States of America*, 2017 WL 370811 at **5-6 (W.D.N.Y. Jan. 26, 2017), in which the court directed the parties randomly select 40 projects as a pilot sample to assist the parties and the court in determining whether the 159 project files were amenable to any sampling method, and depending on the degree of similarity among the 159 projects, the proper size of such a sample.  The court also directed the parties propose a scheduling order for further proceedings including potential trial in the case.  In accordance with the court's direction, Plaintiffs' proposed a stratified sample based on project size, *i.e.*, contract costs similar to that developed for the case by an IRS statistical advisor, *see* Dkt. 33-5, during the audit process conducted in 2007 using the 40 projects comprising the pilot sample to increase the likelihood that the resulting sample will be reasonably representative of all 159 projects.  Dkt. 64 at 2-3.  Specifically, Plaintiffs suggest randomly drawing three projects from each of four cost-based groups (strata) for a total of 12 projects to constitute a random sample of approximately 8% of the 159 projects which now form the basis of Plaintiffs' claim.  *Id.* at 3-5.  Plaintiffs also submitted a proposed scheduling order proposing, *inter alia*, an August 31, 2017 discovery cut-off and a January 15, 2018 cut-off for dispositive motions.  Defendant opposes any schedule that does not allow for at least six-months of discovery.  Dkt. 65 at 6.

In its response, Defendant rejected Plaintiffs' proposed sampling method proposing, instead, as a sample for both discovery and determination of the merits of Plaintiffs' claim, that the court approve a sample either comprising all 40 projects

identified in the pilot sample, or a smaller number of projects if selected by the court from among all of Plaintiffs' 159 projects ("the judgment sample"). *See* Dkt. 65 at 1, 2. However, because Defendant asserts the amounts of QREs Plaintiffs had previously submitted to the IRS during the agency's review of Plaintiffs' claim has resulted in significant variations, when compared to data Plaintiffs submitted in this action, Dkt. 65 at 3, and in order to (1) definitively establish the total value of all QREs for Plaintiffs' 159 projects asserted by Plaintiffs, (2) correctly calculate the amount of refund to which Plaintiffs are entitled to recover based on the QREs established for the sample projects, (3) establish Plaintiffs' methodology for determining Plaintiffs' QREs, *e.g.*, "estimation,"[1] and (4) calculate the "base amounts and fixed-base percentages that plaintiffs claim,"[2] Defendant contends discovery directed to these fact questions for all 159 projects is nevertheless required to assure the sampling process determined by the court does not "relieve plaintiffs of their burden with regard to their claim for refund." Dkt. 65 at 2 & n. 1, 5, and 8.

In reply, Plaintiffs state Plaintiffs agree that discovery may be directed to the qualifications of Plaintiffs' QREs, quantification of R&D expenses under § 41 for qualified R&D activities, Plaintiffs' methodology for determining the quantification of Plaintiffs' R&D expenses used to calculate Plaintiffs' claims § 41 tax credits, and the

---

[1] Plaintiffs state that Plaintiffs "did not calculate the qualified research project [*sic*] on a project basis, CRA utilized a hybrid cost center approach as outlined in the original tax study [by Axiom, Plaintiffs' R&D refund consultant] and in response to [IRS] information requests during examination." Dkt. 67 at 5.

[2] Under § 41, the R&D tax credit is an amount equal to 20% of any excess of the taxpayer's QREs for a taxable, *i.e.*, credit year, over a base amount, 28 U.S.C. § 41(a)(1), which amount is defined as the product of the fixed-base percentage and the taxpayer's average gross receipts for the four years preceding the credit year, § 41(c)(1), but not less than 50% of the QREs for the credit year. § 41(c)(2). The fixed-base percentage is generally the lesser of 16% of the percentage of the aggregate QREs of the taxpayer for the base period years, or the aggregate gross receipts of the taxpayer for those years. *See* § 41(c)(3)(A) and (C). *Suder v. Comm'r of Internal Revenue*, 2014 WL 4920724, at **12-13 (U.S. Tax Ct. 2014).

base amounts and fixed-base percentages Plaintiffs used to calculate Plaintiffs' claimed § 41 credits. *See* Dkt. 67 at ¶ 1. However, Plaintiffs oppose Defendant's demand that such discovery should be directed to all 159 projects as inconsistent with Defendant's agreement to utilize a sample and the court's indicated preference as the basis for litigation on the merits of Plaintiffs' claim, and contend such discovery should instead be limited to those projects comprising the randomized sample as selected by the court, preferably the stratified random sample drawn from the 40 project pilot sample. *Id.* ¶¶ 7-9. According to Plaintiffs, Defendant's insistence that some discovery or merits-determination be directed against and derived from all 159 projects contradicts the use and benefits of any sampling technique the court may select to the extent agreed upon by the parties. *Id.* ¶¶ 9-10. In particular, Plaintiffs object to any discovery directed to the 159 projects which now form the basis of Plaintiffs' tax refund claims for the purpose of ascertaining the total value of the QREs Plaintiffs claim for all 159 projects as unnecessary. Dkt. 67 ¶¶ 18-19. As Plaintiffs state, "[d]elineations of the amount of qualified research expenses on a project-by-project basis across 159 projects is not necessary to <u>apply the results of a sample as long as the overall/total amount of qualified research expenses, as claimed by CRA, is discernable.</u>"[3] Dkt. 67 ¶ 22[4] (underlining added). In an R&D tax credit dispute, the amount of QREs for a taxpayer's fixed-base period are stated on Plaintiffs' Form 6765 and the amount of QRE claims for

---

[3] Unless indicated otherwise, underlining is added.

[4] The court notes the Amended Complaint, based on the 159 projects at issue, realleges in apparent error, *see* Dkt. 51 ¶ 11, Plaintiffs' allegations as stated in the Complaint that Defendant improperly disallowed $700,463 in R&D tax credits for Plaintiffs' 2002 tax years and $795,978 in such credits as the Complaint alleged, *see* Dkt. 1 ¶ 11, based on all of the 6,100 projects which are no longer at issue in the case.

Plaintiffs' credit years as stated in Plaintiffs' tax returns for the tax years at issue.  Thus, the asserted value of Plaintiffs' QREs are known quantities.

Defendant's assertion that discovery (and, presumably, trial) is required to ascertain the total value of the Plaintiffs' QRE claim in order to justify applying the "results of a judgment sample," Dkt. 65 at 2, is without merit.  First, while similar to a "statistical sample," the type of sampling contemplated by the court in this case, use of a "judgment sample," may facilitate auditing of a taxpayers' R&D tax credit claims, IRS Field Directive On The Use of Sampling Methodologies in Research Credit Cases, Dkt. 57-4 at 1, and may provide a valid basis for ascertaining claims of R&D tax credits generated by a taxpayer's alleged QRE only if the resulting sample is representative of all projects upon which Plaintiffs' claim is predicated.  *See* Legal Guide to the Research Credit § 8.8 (Westlaw 2017) (noting that "judgment sampling . . . relies on the judgment of the person selecting the sample," and, as such, lacks the "statistical foundation" and "confidence levels" achievable by random sampling).  "If a sample is selected at random such that every member of the population [Plaintiffs' 159 projects][5] has a known chance of being selected . . . then based on principles of probability and statistics, it is possible to estimate characteristics of the population being sampled within calculable ranges of accuracy."  *Id.*  A representative sample, particularly a random statistical sample of Plaintiffs' 159 projects, obviates the risk that all or some portion of Plaintiffs' QREs associated with the projects are unsupportable and therefore cannot satisfy each requirement of § 41.  For example, in *Suder,* 2014 WL 4920724, at *20, the court found, based on a review of a stipulated sample of 12 of 76 disputed projects, that

---

[5]  Unless indicated otherwise, bracketed material is added.

11 of the 12 projects constituted valid QREs resulting in a determination that 91.67% (11/12ths) of the "76 projects constitute qualified research." *Id.* Similarly, in the instant case, requiring a random statistical sample – not a judgment sample – provides greater assurance that the results of discovery and trial limited to the underlying facts of such sample will yield results, *i.e.*, compliance with § 41's requirement and Plaintiffs' substantiation of Plaintiffs' expenses related thereto, that may then be applied to the asserted QRE values of Plaintiffs' 159 projects upon which Plaintiffs' amended refund claims are based. As noted, Plaintiffs do not oppose discovery, based on such a sample, directed to Plaintiffs' methods for determining Plaintiffs' claimed R&D tax credits including calculation of the required base period and fixed base percentage. *See* Dkt. 67 ¶¶ 37, 38. Such sampling has been accepted by courts, *see Bayer v. United States*, 2:09-CV-0035 (W.D.Pa. Mar. 23, 2015), Order of Court, Dkt. 210 (authorizing a partial trial to determine whether sampling should be used based on 10 randomly selected plaintiff's costs centers),[6] and the IRS for determination of tax credits under § 41.

Further and contrary to Defendant's supposition, Dkt. 65 at 2, use of the statistical sample in this case excluding discovery to establish the actual amount of Plaintiffs' QREs for all 159 projects, does not relieve Plaintiffs of Plaintiffs' burden to establish the value of such QREs. Plaintiffs will nevertheless be required to establish the value of Plaintiffs' asserted QREs for each of the 12 sampled projects as a required element of Plaintiffs' claim and the actual percentage of such asserted values of the QREs within the sample to the extent the evidence supports and is found by the court.

---

[6] Cited in Legal Guide to the Research Credit § 8.11 n. 15. According to the docket for the *Bayer* case, the case was recently, on July 17, 2017, settled without conducting the partial trial.

Thus, if the proof (assuming the other QRE requirements are met by Plaintiffs) shows that the value of Plaintiffs' QREs within the sample are only substantiated to the extent of, for example, 50% of the amount of Plaintiffs' claim, then Plaintiffs' total QRE claims for all 159 projects as reflected in Plaintiffs' tax returns and pleadings will be similarly reduced by the court. Defendant cites to no caselaw where such a hybrid approach, as Defendant proposes, to development of the record and trial was required in an R&D tax credit case nor statistical support from treatises or expert opinion on this issue. Defendant's latest objection, filed July 11, 2017, that palpable discrepancies in Plaintiffs' QRE submissions raise the possibility of abuse by Plaintiffs absent discovery to Plaintiffs' asserted QREs for all 159 projects, Dkt. 68 at 2, overlooks that Plaintiffs will be required to substantiate for the sampled projects every element required for a valid QRE and that any discrepant data could adversely affect the court's determination on the merits. Defendant's further objection that unless discovery is directed to all 159 projects Plaintiffs may attempt to wrongfully "shift claimed QREs" from projects Plaintiffs are "unable to support" to others "outside the sample," *id.* at 2-3, was addressed by the court's May 18, 2017 D&O (Dkt. 62) in which the court found Plaintiffs' record keeping system sufficiently to assure the integrity of Plaintiffs' project records thereby minimizing such risk to the integrity of the sample as Defendant theorizes. Accordingly, Defendant's contention that discovery and trial must be permitted for all 159 projects in order to require Plaintiffs establish the actual amount of QREs alleged by Plaintiffs and other issues pertaining to the validity of Plaintiffs' asserted QREs for all such projects is inconsistent with the principles underlying statistical sampling, judicial precedent, and lacks merit. The court therefore turns to the appropriate sampling methodology for discovery and trial in this case.

Plaintiffs request the court require use of 40 projects resulting from the pilot sample as the basis for a stratified sampling method involving 12 projects. *See* Dkt. 64 at 3-5; Dkt. 67-1 at 2-4. Defendant opposes and requests limiting any sampling to the pilot sample and argues that the 40 project sample or a random sample of the 159 projects be used as the basis to determine Plaintiffs' claims. *See* Dkt. 65 at 4 n. 2. Plaintiffs also point out that Defendant has received Plaintiffs' discovery (interrogatory responses) directed to the 40 projects comprising the pilot sample. Dkt. 67 ¶ 14. Additionally, Defendant has not pointed to anything regarding the 40 projects sampled on a pilot basis that would support a conclusion that for some reason they are not representative of Plaintiffs' 159 projects nor referenced any competent authority advising against the use of the pilot sample to establish a preferred sampling technique. Indeed, as noted, Defendant proposed as an alternative sample that the projects in the pilot sample be used as the basis for a determination of whether Plaintiffs' 159 projects qualified as QREs. *See* Dkt. 65 at 1, 4 n. 2. However, the court finds that requiring all 40 projects as the basis for further litigation will significantly increase litigation time and expense and burden to the court without significantly increasing the likelihood of valid results. For example, it was necessary for the Tax Court in *Suder* to conduct a three-week trial to determine the merits of respondent's deficiency based on a sample of 12 of petitioner's 76 projects at issue. Dkt. 33-9 at 16, *Suder*, 2014 WL 4920724, at *2. Guided by such experience, a trial in this case based on 40 projects may require more than ten weeks. Moreover, a smaller size sample, 12 of 76, or 15.7% was found acceptable to the court in *Suder*. *See Suder*, 2014 WL 4920724, at *6. Here, accepting Plaintiffs' proposal that 12 projects be sampled based on size, *i.e.*, QRE labor costs, from among the 40 projects forming the pilot sample will produce a sample size of 7.5%.

Such methodology achieves a reasonable balance between the need to proceed using a representative sample, one similar to the stratified sample based on project costs proposed by the IRS statistical consultant to facilitate the audit process in this case,[7] and which does not impose unreasonable burdens on both the litigants and the court. Accordingly, the parties shall proceed to establish a sample of 12 cases in accordance with Plaintiffs' proposal as the basis for further proceedings in this case. The court recommends, that in doing so, in order to avoid further delay, the parties utilize the same randomization software to which the parties agreed in generating the pilot sample. A scheduling order governing further proceedings will be entered by the court.

## CONCLUSION

The parties are directed to proceed to select a random sample of Plaintiffs' projects in accordance with the foregoing.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated:  August 9, 2017
        Buffalo, New York

---

[7]  Such sample was not ultimately used to determine the amount of Plaintiffs' QREs because the IRS audit determined Plaintiffs failed to establish accurately Plaintiffs' base period QRE amounts. *See* Dkt. 65-5, IRS Form 888A, (concluding that "CRA failed to produce the required factual support for the assumptions underlying its base period calculations."), *id.* at 3.