UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CRA HOLDINGS US, INC. AND SUBSIDIARIES,

                           Plaintiffs,

     v.

UNITED STATES OF AMERICA,

                           Defendant.
_____

**DECISION**
**and**
**ORDER**

**15-CV-239W(F)**

APPEARANCES:        ZERBE FINGERET FRANK & JADAV
                          Attorneys for Plaintiffs
                          JOHN H. DIES,
                          JEFFERSON H. READ,
                          ROBERT G. WONISH, II, of Counsel
                          3009 Post Oak Boulevard, Suite 1700
                          Houston, Texas   77056

                          RICHARD E. ZUCKERMAN
                          Principal Deputy Assistant Attorney General
                          Tax Division, U.S. Department of Justice
                          Attorney for Defendant
                          JAMES M. STRANDJORD,
                          Trial Attorney, of Counsel
                          PO Box 55
                          Ben Franklin Station
                          Washington, DC 20044


       In this action Plaintiffs, a national environmental remediation consulting firm,

seek to recover tax refunds of $245,077 for Plaintiffs' 2002 tax year ending

September 30, 2002, and $413,066 for Plaintiff's 2003 tax year ending September

30, 2003, based on tax credits for qualified research expenses ("QREs") ("Plaintiffs'

claim").  Plaintiffs initially sought refunds in the amount of $700,463 for Plaintiffs'

2002 tax year and $795,978 for Plaintiffs' 2003 tax year based on 6,100

environmental remediation projects in which Plaintiffs were engaged; however, subsequently, in Plaintiffs' Amended Complaint, filed March 20, 2017, Plaintiffs reduced to 159 the number of projects upon which Plaintiffs' claim is based.  At Plaintiffs' request, opposed by Defendant, in order to streamline litigation of the matter, the court determined that the case should proceed based on a random sample of 10% of the 159 projects.  *See CRA Holdings U.S., Inc. v. United States*, 2017 WL 3404758, at *1 (W.D.N.Y. Aug. 8, 2017).  Following several rounds of interrogatory practice Defendant, on January 17, 2018, served Defendant's Fourth Set of Interrogatories directed to the 12 projects upon which Plaintiffs rely to support Plaintiffs' claim including Interrogatories Nos. 10 and 11 ("Interrogatory No. __"). Dkt. 95-3 at 2.  Interrogatory No. 10 requests "[f]or each claimed project" Plaintiffs "identify each employee that you [Plaintiffs] contend performed qualified service."[1] Interrogatory No. 11 requests for each employee Plaintiffs identify in answer to Interrogatory No. 10, Plaintiffs further identify "the specific activitys(ies) [*sic*] that each employee performed" during Plaintiffs' taxable years 2002 and 2003 which Plaintiffs (1) "contend qualified as services for each project" comprising the 12 projects selected as a representative sample of the 159 projects asserted by Plaintiffs, (2) the dates when these activities were performed, (3) the amount of time spent by each identified employee in the performance of such "qualified services," and (4) the "amount of qualified research expenses associated with the activity."

As the term "qualified services" was not defined in Defendant's Fourth Set of Interrogatories the following summary of 26 U.S.C. § 41 which creates the R&D tax

---

[1]   Unless indicated otherwise, underlining and bracketed material is added.

credit upon which Plaintiffs claim is based ("§ 41___") provides such definition and is intended to assist in an understanding of the relevance of Interrogatories Nos. 10 and 11 to the merits of Plaintiffs' claims and the concomitant importance of Plaintiffs' responsive answers to Defendant's ability to defend against Plaintiffs' claims.  The research credit available under § 41 is defined as 10% of the excess of the taxpayer's qualified research expenses or QREs for the relevant tax year over the base amount.  § 41(a)(1).  The base amount is the product of the fixed base percentage and the taxpayer's average annual gross receipts for the four years preceding the tax year for which the credit is sought.  § 41(c).  The fixed base percentage is the percentage which the taxpayer's aggregate QREs for the taxpayer's tax years from January 1, 1984 through December 31, 1988 is of the taxpayer's aggregate gross receipts for this period.  § 41(c)(3)(A).[2]  A taxpayer's QREs are defined as both in-house and contract research expenses "paid or incurred by a taxpayer in the taxpayer's trade or business.  § 41(b)(1), (2).  In-house research expenses are defined as "wages paid or incurred to the taxpayer's employee for qualified services . . . and related "supplies."  § 41(b)(2)(A)(i), (ii).  The term "qualified services . . . means services [where the taxpayer's employee is] engaging in qualified research, or the direct supervision or support" of such services.  § 41(b)(2)(B)(i), (ii).  As relevant to Defendant's motion, qualified research is defined as "research . . . undertaken for the purpose of discovering information . . . which is technological in nature the application of which is "intended to be useful in the development of a [taxpayer's] new or improved business component . . . where

---

[2]  For a representation of the formula created by these provisions *see CRA Holdings US, Inc. v. United States*, 2018 WL 3390240, at *7 (W.D.N.Y. July 12, 2018) (Appendix).

"substantially all the [taxpayer's research] activities . . . constitute elements of a process of experimentation . . . for [the taxpayer's] (i) new or improved function, (ii) performance, or (iii) reliability or quality." § 41(d)(1), (3). A taxpayer's "business component" includes "any product, process, computer software, technique, formula, or invention . . . held for sale or lease or used by the taxpayers in a [taxpayer's] trade or business." § 41(d)(2)(B).

The tests for determining whether a taxpayer's research expenses are qualified under § 41(d)(1), *see Shami v. Comm'r*, 741 F.3d 560, 563 (5th Cir. 2014) (summarizing the requirements for R&D expenses to qualify for computing an alleged § 41 tax credit), are required to be applied to each of the taxpayer's business components to which such expenses are claimed by the taxpayer to relate. § 41(d)(2); *see also United States v. Quebe*, 2017 WL 279539, at **2-3 (S.D. Ohio Jan. 23, 2017) (citing *Suder v. Comm'r,* 2014 WL 4920724, at *14 (T.C. 2014). To summarize, "qualified services" are services performed by a taxpayer in qualified research. Expenses related to a taxpayer's research are qualified services if four tests are satisfied. *Quebe*, 2017 WL 279539 at *3 (citing *Suder*, 2014 WL 4920724, at *14).[3] First, the expenses must be eligible for deductibility under 26 U.S.C. § 174 in that they are "incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental <u>or</u> laboratory sense." *Quebe*, 2017 WL 279539, at *3 (quoting 26 C.F.R. § 1.174-2).[4] Specifically, such experimental or laboratory expenses must be "intended to

---

[3] *Quebe* was an action brought against the taxpayers pursuant to 26 U.S.C. § 7405(b) for repayment of an erroneous refund based on taxpayers' § 41 tax credits.
[4] Unless indicated otherwise all underlining is added.

discover information that would eliminate uncertainty concerning the development or improvement of a [taxpayer's] product. Uncertainty exists if the information available to the taxpayer does not establish the capability or method for developing or improving the product or the appropriate design of the product." *Id.* Second, under the "technological information test" the research at issue will qualify if it seeks to discover information that is technological in nature, *i.e.*, that involves a "process of experimentation" which "fundamentally relies on principles of the physical or biological sciences, engineering or computer science," 26 C.F.R. § 41-4(a)(4), (a)(3)(i), and "'if it is intended to eliminate uncertainty concerning the development or improvement of a business component.'" *Id.* (quoting 26 C.F.R. § 1.41-4(a)(3)(i)). Third, the asserted expenses will qualify under the business component test if the taxpayer intends information to be discovered will "'be useful in the development of a new or improved business component of the taxpayer.'" *Quebe*, 2017 WL 279539, at *3 (quoting *Suder*, 2014 WL 4920724, at *17 (citing 26 U.S.C. § 41(d)(1)(B)(ii))). Finally, "the process of experimentation test" requires that "substantially all of the research activities" claimed by the taxpayer "must constitute elements of a process of experimentation for the purpose of relating to a new or improved function, performance, or reliability or quality." *Quebe,* 2017 WL 279539, at *3 (citing 26 U.S.C. § 41(d)(1)(C), (3)(A)). As relevant to the instant case, "[a] process of experimentation is a process designed to evaluate one or more alternatives to achieve a result where the capability or the method of achieving that result or the appropriate design of that result is uncertain as of the beginning of the taxpayer's research activities," and which relies on "principles of the physical or

biological sciences, engineering, or computer science" involving "identification of uncertainty concerning the development or improvement of a business component," the identification and evaluation of alternatives to eliminate that uncertainty," and a "process of evaluating the alternatives (through, for example, modeling, simulation, or a systematic trial and error methodology)." 26 C.F.R. § 1.41-4(a)(5)(i).[5]

Interrogatory No. 10 thus requests Plaintiffs identify each of Plaintiffs' employees whom Plaintiffs allege have performed research activities that are research or experimental in nature and which are aimed discoveries of a technological nature, intended to develop a taxpayer's new or improved business component thus constituting a QRE for purposes of computing the existence of a claimed research credit under § 41(a). Interrogatory No. 11 requests Plaintiffs to "identify the specific [research] activity(ies) [*sic*] that each employee performed that you [Plaintiffs] contend constituted qualified services for each project, including the date(s) the activity(ies) [*sic*] was performed, the amount of time the employee spent performing the qualified services, and the amount of qualified research expenses associated with the activity." Dkt. 95-3 at 2 ("Interrogatory No. 10," Interrogatory No. 11," collectively "the Interrogatories" or "Defendant's Interrogatories"). As the preceding overview of the requirement for a tax credit based on Plaintiffs' alleged QREs incurred in connection with each of the 12 sample projects indicates, whether Plaintiffs' expenses associated with these projects constitute "qualified services" under § 41 and related I.R.S. regulations is essential to Plaintiffs' claim. Thus, Plaintiffs do not dispute that Defendant's Interrogatories Nos. 10 and 11 seek

---

[5] Unless indicated otherwise all bracketed material added.

relevant information.  Nor do Plaintiffs contend Defendant's Interrogatories request

information that is disproportional to "the needs of the case" in violation of

Fed.R.Civ.P. 26(b)(1).  Further, as also relevant to Defendant's motion, because

"'[t]ax credits are a matter of legislative grace . . . taxpayers bear the burden of

proving they are entitled to claim tax credits."  *Quebe*, 2017 WL 279539, at *2

(quoting *Suder*, 2014 WL 4920724, at *12 (citations omitted)); *see also* 26 C.F.R. §

1.41-4(d) ("A taxpayer claiming a credit under section 41 must maintain records in

sufficiently useable form and detail to substantiate that the expenditures claimed are

eligible for the credit.")

Plaintiffs' response to Interrogatory No. 10, served February 19, 2018,

consisted of Plaintiffs' statement that Plaintiffs' qualified research expenses were

not recorded by project and that Plaintiffs provided to Defendant a list of employees

who recorded time on each project, but that the time recorded did not allocate such

time between qualified and non-qualified research services for each project.  Dkt.

95-4 at 18 (referencing Bates No. CRA 459109-CRA 459156 (Dkt. 95-4 at 23-70).

In lieu of actual specific time data for each employee, as Interrogatory No. 10

requests, Plaintiffs stated that an "estimated percentage of time spent on qualified

research activities per year per employee has been produced [to Defendant]" in a

document provided by Plaintiffs, as Bates Nos. CRA 2692-CRA 2711.  Dkt. 95-4 at

18.  This document was not included in Defendant's motion; however, it is attached

as Exhibit 4 to Plaintiffs' Supplemental Response to Defendant's Motion, filed July

13, 2018, *see* Dkt. 115-4 at 1-20.  Plaintiffs also stated as a "further answer" to

Interrogatory No. 10 that project documents, provided to Defendant as CRA 4164-

CRA 459104 "reflect[ ] the work done on the project and dates . . . which support

the estimations of the percentage of time [Plaintiffs'] employees spent performing

activities." Dkt. 95-7 at 21 (Plaintiffs' Amended answers served March 1, 2018).

These voluminous documents are not included in the record. Plaintiffs further

asserted in Plaintiffs' response that Plaintiffs' use of estimates regarding the time

spent per employee performing qualified services was permitted under the so-called

"*Cohan*[6] line of cases, as applied in the R&D tax credit context." Dkt. 95-4 at 19.

For Plaintiffs' response to Defendant's Interrogatory No. 11, also served

February 19, 2018, Plaintiffs stated, like Plaintiffs' response to Interrogatory No. 10,

that Plaintiffs could not provide specific information because Plaintiffs did not

maintain contemporaneous records for the actual time spent by Plaintiffs'

employees on qualified research activity or related expenses in connection with the

projects, and that such time and expenses were therefore estimated on an annual

basis. Dkt. 95-4 at 19. Plaintiffs further stated that Plaintiffs' estimates of qualified

research time by Plaintiffs' employees on the projects on an annual basis had been

provided in Plaintiffs' documents provided in Bates Nos. CRA 2692-CRA 2711.[7]

Dkt. 95-4 at 19. As with Interrogatory No. 10, Plaintiffs also relied on the projects'

documents produced to Defendant as CRA 4164-CRA 459104. *See* Dkt. 95-8 at

21. As to the interrogatory's request for a description of the specific research

activity each employee performed on each project, Plaintiffs' answer referred

Defendant to Plaintiffs' responses to Defendant's Interrogatory No. 8. Dkt. 95-4 at

19. Defendant's Interrogatory No. 8 requested Plaintiffs describe what Plaintiffs'

---

[6] Referring to *Cohan v. Comm'r*, 39 F.2d 540 (2d Cir. 1930) discussed, *infra*, at 26-27.
[7] Copies of these documents are included in the record at Dkt. 115-4.

experiments[8] for each project consisted of, and Plaintiffs' identification of each of Plaintiffs' employees who worked on such experiments, the time spent by the employee on each experiment together with a description of the "uncertainty the experiment was intended to eliminate." Dkt. 95-4 at 3. In Plaintiffs' response to Interrogatory No. 8, Plaintiffs described in general form the activity in which Plaintiffs engaged for each project making reference to Bates numbered documents Plaintiffs asserted had been provided to Defendant. Dkt. 95-4 at 3-18. Plaintiffs also responded (Dkt. 95-8 at 9) that the identification of Plaintiffs' alleged uncertainties were previously provided in Plaintiffs' responses to Defendant's Third Set of Interrogatories. Dkt. 99-5 at 3. For example, for the Project 003698 – Cambrex – RI/FS Maybrook Superfund – Cambrex Corporation, Plaintiffs describe an investigation "of the release of hazardous substances, pollutants or contaminant from the site" requiring Plaintiffs to undertake "a detailed site investigation" to determine the site's geologic hydrology, and chemical characteristics, including treatability and natural attenuation studies in order to recommend appropriate remedial actions for the site to address the pyridine[9]-based compounds located at the site. Dkt. 95-4 at 4. Plaintiffs stated such work was performed during the period 1991, 1995, 1996, and 2001-2003 which resulted in a final approved report in 2006. Dkt. 95-4 at 5. In none of Plaintiffs' descriptions responsive to Interrogatory No. 8, however, do Plaintiffs identify any of Plaintiffs' employees who engaged in the

---

[8]   As the term "experiment" is not defined in Defendant's Fourth Set of Interrogatories, the court assumes it is intended to be defined by 26 C.F.R. § 1.41-4(a)(5)(i).

[9]   Pyridine, a carbon-nitrogen liquid compound made from coal-tar and other chemicals, is used in various pharmacologic and industrial products, and is considered carcinogenic. *See* National Center for Biotechnology Information. PubChem Compound Database; CID=1049, https://pubchem.ncbi.nlm.nih.gov/compound/1049 (last accessed Aug. 14, 2018).

projects nor the time spent by employees engaged in qualified research for each project described by Plaintiffs.

By letter dated February 22, 2018, Defendant advised Plaintiffs that Plaintiffs' responses to Interrogatory Nos. 8, 10 and 11 were deficient in that none provided the requested information, that Plaintiffs failed to particularize the actual activities Plaintiffs claim to constitute qualified research for each project, the names of employees Plaintiffs claim were engaged in such activities, nor did Plaintiffs provide the amount of time associated with employees so engaged for each project within the sample. Dkt. 95-5 at 1. In Plaintiffs' response, dated February 28, 2018, Plaintiffs also stated that Defendant had been provided all available records and reiterated Plaintiffs had no records which "tracked [research] activity by project." Dkt. 95-6 at 1. On March 1, 2018, Plaintiffs served Plaintiffs' Amended and, on March 5, 2018, Second Amended responses to Defendants' Interrogatories. Dkt. 95-7 at 1-15; Dkt. 95-8 at 1-24. Defendant filed its motion to compel on March 13, 2018 (Dkt. 95) ("Defendant's motion"). In neither Plaintiffs' Amended nor Second amended responses did Plaintiffs provide any material modifications to Plaintiffs' original responses to Interrogatories 8, 10, and 11. However, in Plaintiffs' Third Amended responses, served on March 27, 2018, in opposition to Defendant's motion, Dkt. 99-5 at 3-22, Plaintiffs amended Plaintiffs' response to Interrogatory No. 8 in which Plaintiffs asserted that further descriptions of Plaintiffs' qualified research activities were available in previously provided documents specifically Bates Nos. CRA 2556-2577; 2595-2597; 2598-2615, 2616-2629, and 2529-2655. Dkt. 99-5 at 3. These documents are not, however, included in the record by

Plaintiffs nor do Plaintiffs rely on them in Plaintiffs' opposition.  *See* Dkt. 99 at 5.

The court therefore does not consider them in its determination of Defendant's

motion.  Oral argument on Defendant's motion was deemed unnecessary.

Defendant contends that Plaintiffs' responses to Defendant's Interrogatories

are deficient for several reasons.  First, while Interrogatory No. 10 requests Plaintiffs

identify by name those of their employees Plaintiffs assert performed qualified

services on each project, Plaintiffs provided a list of all employees who worked on

each project without indicating which employees performed qualified services on

specific projects and, instead, asserted Plaintiffs could respond by estimating the

amount of time each employee actually engage in qualified services for each

project.  Dkt. 95-2 at 6.  Similarly, in answer to Defendant's Interrogatory No. 11

requesting Plaintiffs identify specifically the activities in which Plaintiffs' employees

engaged on each project that constituted qualified services including the date

performed, amount of time spent in performing the services and the related

amounts of expenses, in response, Plaintiffs again asserted Plaintiffs lacked

contemporaneous records which would enable Plaintiffs to provide complete

answers to Defendant's questions and that Plaintiffs had provided estimates of the

percentage of all qualified services time for Plaintiffs' employees who performed

services on the projects on an annual basis, not by project.  Dkt. 115 at 3.  Plaintiffs

also directed Defendant to Plaintiffs' response to Interrogatory No. 8.  Dkt. 99 at 5 n.

1.  Plaintiffs further contend that Defendant overlooked Plaintiffs' reference to Bates

numbered documents which Plaintiffs state provided "the list of [Plaintiffs]

employees who were claimed to performed [*sic*] qualified research activities."  Dkt.

99 at 4 (referencing Dkt. 115-4 at 1-20). However, as Defendant points out, Plaintiffs' answers to Interrogatory No. 8 does not provide any reasonably detailed description of Plaintiffs' qualified services, rather it articulates only generalized statements of the types of evaluation and determination of remedial alternatives that were undertaken by Plaintiffs in work on the project. Dkt. 95-2 at 8. Significantly, however, Plaintiffs' answer to Interrogatory No. 10 does not point to a document which lists "employees who were claimed to performed [*sic*] qualified research activities". Rather, Plaintiffs' answer states that "[t]he lists of employees who recorded <u>time</u> spent on each of the 12 projects may be found on the attached Exhibit I – CRA 459109-CRA 459156." (referencing Dkt. 95-4 at 18). Importantly, as Plaintiffs' response does not state that any of this time involved "qualified research activities;" it is therefore unresponsive to Interrogatory No. 10. Plaintiffs do not dispute that the amount of time Plaintiffs' employees applied to qualified services for each project is relevant to Plaintiffs' claim, nor could they. *See Quebe*, 2017 WL 279539, at *20 (plaintiff's interrogatory requesting defendants provide defendants' employees "hours . . . worked" on projects defendants based defendants' § 41 tax credits upon required defendants' response and "a detailed description of the specific work" the employees performed on the projects). Moreover, an examination of this document demonstrates it provides no indication that any of the numerous employees listed performed qualified research on any of the projects. *See* Dkt. 115-3 at 1-48 (*passim*). Plaintiffs also asserted that the estimated time Plaintiffs were engaged in qualified research was produced as CRA 2692-CRA 2711 (Dkt. 11-4 at 1-20). Dkt. 99-3 at 18. That in lieu of

contemporaneous records which specifically record the amount of qualified service time by each of Plaintiffs' employees per project Plaintiffs have sought to estimate the amount of time so spent, does not however, reasonably answer Defendant's interrogatory, which is obviously intended to enable Defendant to challenge whether any qualified services were actually performed by Plaintiffs' employees involved in any of the 12 projects. For example, if Defendant was able to ascertain which employees Plaintiffs assert, based on Plaintiffs' review of Plaintiffs' available records, actually engaged in qualified services for each project, Defendant can determine whether it should depose such employees, or some subset of the group, to determine whether Plaintiff's representations are accurate and are based in fact. *See United States v. Quebe*, 321 F.R.D. 303, 311 (S.D.Ohio 2017) (sanctioning taxpayer defendants for failure to adequately answer plaintiff's interrogatories requesting description of defendant's asserted R&D work to support defendant's tax refund based on sample of 12 projects where such failure "prejudices plaintiff by forcing [plaintiff] to prepare for . . . depositions without essential information"). Simply estimating the amount of employee time a taxpayer believes was spent on qualified services substantially begs the question of whether such qualified services were in fact provided by any of Plaintiffs' employees on the project.

Plaintiffs' reliance on Fed.R.Civ.P. 33(d) ("Rule 33(d)"), Dkt. 99 at 3, is misplaced. Rule 33(d), which permits in lieu of a direct answer to an interrogatory a responding party to specify its business records from which the requesting party may derive an answer, is inapplicable to the present facts because it is not possible for Defendant to obtain a reasonably accurate answer to Interrogatory No. 10 from

the documents relied by on Plaintiffs. In particular, although Plaintiffs provided documents purporting to list all employees who worked on the 12 projects between June 2001 and December 2003, given that Plaintiffs' tax years at issue are October 2001 to September 2002, and October 2002 to September 2003, a listed employee as provided by Plaintiffs may have worked on a project before or after Plaintiffs' tax years at issue commenced or ended. Additionally, because Plaintiffs concede that most of Plaintiffs' listed employees did not perform qualified service on all of the projects 100% of the time, *see* Dkt. 115-4 at 3-20 (indicating Plaintiffs' estimated a portion of employee research time associated with the projects <u>did</u> <u>not</u> <u>exceed</u> 80%), Plaintiffs' records do not allow Defendant to readily determine the portion of an employees' claimed research activity was spent on any project. Nor could Plaintiffs, as Plaintiffs also claim that Plaintiffs lack any records which associate Plaintiffs' employees' alleged qualified research time by project, Dkt. 99-2 at 1. Even if Plaintiffs rely on 26 C.F.R. 1.41-2(d)(2) (permitting a taxpayer to claim all of an employee's research time if "substantially all" of such time, meaning at least 80% is devoted to qualified research activity) (§ 1.41-2(d)(2)"), Plaintiffs do not deny that, as Defendant contends, Dkt. 100 at 2, this list (Dkt. 115-4 at 1-20), including Bates Nos. CRA 2692-CRA 2711, was created when Plaintiffs originally asserted 6,100 projects supported Plaintiffs' original claim and has not been parsed by Plaintiffs to relate only to the 12 sample projects now at issue. Moreover, as noted, Plaintiffs stated such portion did "<u>not</u> <u>exceed</u> 80%" negating the applicability of § 1.41-2(d)(2). Thus, Plaintiffs, whether purposefully or not, would impose on Defendant the task of culling out from among 913 employees who are listed on this document (Dkt. 115-4)

and are among Plaintiffs' employees who Plaintiffs assert performed qualified

research services in connection with the 6,100 projects, including the 12 sample

projects, in varying percentages of their respective total time, in order to attempt to

determine which of Plaintiffs' listed employees actually performed any such services

on any of the 12 projects.  Plaintiffs' failure to identify which of its employees

actually performed any qualified services on each sample project is particularly

remarkable in view of Plaintiffs' prior representations in this case that if sampling

were approved by the court, Plaintiffs would "provide information [requested by

Defendant] on a project by project basis" (Dkt. 31 at 23); *see also* Dkt. 36 at 1

("CRA has repeatedly indicated willingness to provide most of the information

requested once the project list to be tried has been limited to a sample.").

Plaintiffs' reliance on Rule 33(d) which requires that the "burden of deriving

or ascertaining the answer will be substantially the same for either party," is further

undermined by the fact that § 41 requires a taxpayer to "retain records in sufficiently

usable form and detail to substantiate that the expenditures [*i.e.*, qualified research

activities] claimed are eligible for the credit."  26 C.F.R. § 1.41-4(a), (d).  Plaintiffs'

reliance on these lists, Dkts. 94-5, 115-4, and other documents referenced by

Plaintiffs in responding to Defendant's Interrogatories therefore amounts to a

"document dump" (defined as "the projection of voluminous and mostly

unresponsive documents without identification of specific pages or portions of

documents which are responsive to discovery requests"), which courts have found,

in a R&D tax credit context, to be unresponsive to the plaintiff's interrogatory

seeking information (to "identify which [of 12 sample projects] project each

employee worked on and what their job entailed").  *See Quebe*, 321 F.R.D. at 306-07 (quoting *Scott Hutchinson Enter., Inc. v. Cranberry Pipeline Corp.*, 318 F.R.D. 44, 54 (S.D.W.Va. 2016)); *see also Novak v. Yale University*, 2015 WL 731385 at *3 (D.Conn. Nov. 20, 2015) ("Plaintiff's production was a classic example of a 'document dump,' which largely left Defendant with a mass of unmanageable and unusable documents.").  As such, the burden on Defendant to glean from the records provided by Plaintiffs the information requested by Interrogatory No. 10 is not "substantially" equivalent and Plaintiffs may not avoid fully answering Defendant's Interrogatory No. 10 by reliance on Rule 33(d).

The purpose of interrogatories pursuant to Rule 33 is to sharpen the issues and facilitate a party's preparation to more effectively prosecute or defend a claim. *See Black v. Buffalo Meat Services, Inc.*, 2016 WL 4363506, at *7 (W.D.N.Y. Aug. 16, 2016) ("'The point of interrogatories is to obtain a party's admissions and contentions under oath and to narrow the issues in the case.'" (quoting *Life Music v. Broadcast Music, Inc.*, 41 F.R.D. 16, 26 (S.D.N.Y. 1966))).  In answering an interrogatory, a party is required to review all sources of information reasonably available and provide responsive information.  *See Upstate Shredding, LLC v. Northeastern Ferrous, Inc.*, 2016 WL 865299, at *8 (N.D.N.Y. Mar. 2, 2016) (party responding to Rule 33 interrogatories is required "to make an inquiry and obtain information to answer the interrogatories which would include obtaining the information to fully and completely answer the interrogatories . . ." (internal citations and quotation marks omitted)).  Here, it is self-evident that as Plaintiffs possess vastly superior knowledge of what Plaintiffs did for each project that Plaintiffs

believe constitute qualified services, it is reasonable to place the burden on Plaintiffs to provide more detailed information responsive to Defendant's Interrogatories.  *See Quebe*, 2017 WL 279539, at *19 (because of defendants' "inherent understanding of their own projects and [p]laintiff's reasonable lack thereof," placing burden on Plaintiffs as the responding party of identification of "specific aspects of the [claimed R&D] projects does not outweigh the benefits of the requested information").  Thus, if as Plaintiffs assert, Dkt. 115 at 2, "Plaintiff[ ] provided by bates number documents which support the response to Interrogatory No. 10," it is not unreasonable to place the burden on Plaintiffs, not Defendant, to cull out the precise information from Plaintiffs' records responsive to Interrogatory No. 10.  Significantly, Plaintiffs make no representation that all of the employees Plaintiffs listed as having been employed in qualified R&D work during the taxable years at issue, *see* Dkt. 119-4, include all of Plaintiffs' employees Plaintiffs listed, Dkt. 115-3, as having performed such work on each of the projects.

Interrogatory No. 11 requested Plaintiffs to identify for each employee described in response to Interrogatory No. 10 the specific activities each employee performed for each project which Plaintiffs contend constitute qualified services, the date performed, and the amount of employee time incurred together with related expenses.  In response, Plaintiffs stated no records were maintained from which Plaintiffs could respond as to the dates and time such services were performed, *see* Dkt. 95-4 at 19, and, with regard to the requested description of qualified services, Plaintiffs referred Defendant to Plaintiffs' responses to Interrogatory No. 8 ("Plaintiffs' Interrogatory No. 8 responses").  *Id.*  In Interrogatory No. 8, Defendant

requested Plaintiffs describe the experiment Plaintiffs claim to have conducted with respect to the projects, identification of Plaintiffs' employees who worked on the alleged experiment, the work such employees performed in connection with the experiment, the time each employee spent on the experiment and the uncertainty which the experiment was intended to eliminate. As discussed, a "process of experimentation" is a prerequisite to a taxpayer's assertion of qualified services which support a research tax credit. *See, supra*, at 5 (quoting § 41(d)(1)(3)); 5 (quoting 26 C.F.R. § 1.41-4(a)(5)(i)). However, as an inspection of Plaintiffs' responses to Interrogatory No. 8 demonstrates, Plaintiffs' Interrogatory No. 8 responses do not fairly provide a description of qualified services with specific reference to the required "process of experimentation" element Plaintiffs assert were performed for each of the 12 projects. For example, as to Project 003698 – Cambrex – RI/FS Maybrook Superfund – Cambrex Corporation, Plaintiffs explain Plaintiffs were tasked with determining the nature and extent of the release or threatened release of hazardous substances, pollutants or contaminants for the client's site, particularly "pyridine-based compounds" and with "identifying and evaluating alternatives" for appropriate remediation. Dkt. 95-8 at 4. While Plaintiffs' description includes references to the use of "geology, hydrogeology, and chemistry," *id.*, absent is any explanatory material relating to technological uncertainties, as defined by 26 C.F.R. § 1.174-2(a)(1), which confronted Plaintiffs at the outset, *see* 26 C.F.R. § 1.41-4(a)(5)(i), the nature of any technological experimentation in which Plaintiffs' employees engaged while performing work on this project, or how such experimentation could be used to create or improve one of

Plaintiffs' business components, that is a "product, process, computer software, technique, formula or invention for sale, license or lease" as required by § 41(d)(2)(B). In short, Plaintiffs' description is devoid of information indicative of activity directed to developing a new or improved business component through scientific research or technologic discovery using a process of experimentation. As such, Plaintiffs fail to provide reasonably detailed information concerning the nature and scope of this project responsive to Defendant's Interrogatory No. 11.

Another example of Plaintiffs' deficient responses is found in Plaintiffs' description of Plaintiffs' work in regard to project 12902—MSI Ashtabula—Miller Springs Remediation. Dkt. 95-8 at 5-6. Here, Plaintiffs explain Plaintiffs were contracted to address the client's problem of migrating contaminated ground water from the client's facility. *Id.* Plaintiffs also referenced the requirement of determining the "effectiveness of the barrier wall for ground water control and . . . an investigation of the potential for off-site migration." *Id.* How any of these responsibilities constituted technological experimentation directed to developing new or improved products or processes, or addressed real technical uncertainty for Plaintiffs, is not explained. For example, Plaintiffs do not assert the use of a "barrier wall" to control ground water migration was a previously unknown remedy or that its effectiveness at the client's site required experimentation. A fair reading of the balance of Plaintiffs' responses indicates similar deficiencies and given Plaintiffs' presumably superior understanding of Plaintiffs' projects it is not unreasonable to require Plaintiffs to respond with greater particularization. *See Quebe*, 2017 WL 279539, at *19 (granting plaintiff's motion to compel more specific responses to

plaintiff's interrogatory requesting defendants to identify with specificity defendants' asserted business component and uncertainties confronting defendants concerning development or improvement to defendants' business component which support defendants' claim for § 41 research tax credit). In short, nothing in Plaintiffs' responses to Interrogatory No. 11 bespeaks the development by Plaintiffs through scientific research and experimentation anything technologically new or innovative in connection with either of the two projects, at least as presently described by Plaintiffs in response to this interrogatory. Accordingly, Plaintiffs' responses to Defendant's Interrogatory No. 11 are insufficient and required Defendant's motion with respect to this Interrogatory should be granted. The remainder of Plaintiffs' initial responses to Interrogatory No. 11 are also deficient for similar reasons.

Although in Plaintiffs' Third Amended Objections and Responses to Defendant's Interrogatory No. 8, served March 27, 2018, *see* Dkt. 115-1 at 2, after Defendant's motion, Plaintiffs stated that Plaintiffs had provided to Defendant a "further answer for each of the claimed projects," Dkt. 115-1 at 4, a comparison of such "further information" with Plaintiffs' original responses fail to indicate any new information is provided. As with Plaintiffs' initial responses to Interrogatory No. 11 which referred Defendant to Plaintiffs' responses to Interrogatory No. 8 requesting Plaintiffs identify specifically the experiment Plaintiffs performed for each project and the uncertainty Plaintiffs work encountered, a fair reading of Plaintiffs' Third Amended responses fails to indicate any activity by Plaintiffs aimed at the discovery of a new or improved product, process or technique through a process of experimentation that could be reasonably responsive to Interrogatory No. 11. In

Plaintiffs' Third Amended response, "in further answer" to Interrogatory No. 8, Dkt. 99-5 at 21, Plaintiffs also rely on documents produced for the projects at CRA 4164-CRA 459104, comprising (based on Plaintiffs' Bates numbering) a total of 454,940 pages of documents stating that these documents "reflect[ ] the work done on each project, employees who did the work, technical challenges and issues which created uncertainties, and the process used to resolve technical issues and challenges . . .." As discussed, *supra*, at 14-15, Defendant should not be burdened with a review of such an enormous number of documents in order to understand the basis of Plaintiffs' claim; rather, it was Plaintiffs' obligation to do so.

Plaintiffs' answers to Defendant's Interrogatory No. 11 also relied on Plaintiffs' answers to Defendant's Interrogatory No. 8 of Defendant's Third Set of Interrogatories served November 17, 2017. *See* Dkt. 95-4 at 3 (referencing Dkt. 99-6 (1-19)). However, based on the court's review, these answers also fail to specify the nature of Plaintiffs' alleged qualified services for each project that could conceivably respond to Interrogatory No. 11. For example, Plaintiffs' description of its activities regarding Project No. 17177—REALM—Tonowanda [*sic*], Plaintiffs' amended response, Dkt. 99-6 at 18, described Plaintiffs' development of "a new process of remediation" for one of the client's old structures at the site including removal of underground petroleum storage tanks, taking of post-removal soil samples which employed the use of a "PCB Immunoassay Kit" that was, according to Plaintiffs, "new to the industry at the time." Plaintiffs also state Plaintiffs' work "involved the innovative use of a statistical method for sampling and determination of hotspots." However, no explanation of why or how the technological or scientific

nature of Plaintiffs' "new process of remediation" is in fact "new" is provided nor do Plaintiffs explain that, assuming its newness, the PCB Immunoassay Kit was even developed by Plaintiffs, or that the alleged innovative use of a statistical sampling method represents a new technique discovered through experimentation by Plaintiffs in working on this project. Plaintiffs' amended response based on this project for Interrogatory No. 11 is therefore also insufficient.

With respect to Project 003698—Cambrex—RI/FS Maybrook Superfund—Cambrex Corporation, Plaintiffs' amended response, Dkt. 99-6 at 15, *see* Discussion, *supra*, at 8, 17, Plaintiffs assert that Plaintiffs "[e]valuated and recommended a <u>newly</u> developed process of remediation" of the "pyridine-based" chemicals located at the client's site. Dkt. 99-6 at 15. Plaintiffs also stated that Plaintiffs encountered uncertainty as to "the performance of the Monitored Natural Attenuation (MNA) process for groundwater" contamination; as such, the MNA process "was a relatively new approach and the pyridine-based compounds were unique to the site." *Id.* Plaintiffs' amended response is, however, inadequate on its face as regardless of the asserted uniqueness for remediation purposes of the presence of the pyridine compounds located at the site, and the uncertainty of how the MNA would perform, there is no way to determine, based on Plaintiffs' amended response, whether the "newly developed [MNA] process" was one created by Plaintiffs or another entity based on Plaintiffs' work on this project, from technologic or scientific knowledge, or that an experiment involving research was performed by Plaintiffs in its development. As such, Plaintiffs' reliance on this amended response to Interrogatory No. 11 is insufficient.

Project 12902—MSI Ashtabula—Miller Springs Remediation, indicates Plaintiffs' encountered the need to address the particular vapor exposure assessment problem based on the client's manufacture of "specialty chemicals" at the site, Dkt. 99-6 at 10, which, according to Plaintiffs, required Plaintiffs "utilize a novel approach" which [Plaintiffs] had not previously used. However, Plaintiffs' amended response to Interrogatory No. 8 with respect to this project fails to state why, from a technical or scientific perspective, such approach was "novel" and whether such alleged novelty had in fact been developed by Plaintiffs through a process of experimentation in connection with this project. Nothing describing or even implying a process of experimentation directed to an analysis of any uncertainty or alternatives with respect to Plaintiffs' resolution of the vapor assessment phase of Plaintiffs' work on this project is provided in Plaintiffs' amended response. Thus, Plaintiffs' amended response regarding this project is non-responsive to Interrogatory No. 11 seeking reasonable particularization of Plaintiffs' alleged qualified services for this project.

Plaintiffs' amended response for Project 17358-ENCORE-GMPT Willow Run, Dkt. 99-6 at 14, is also deficient in this regard. While it describes the difficulties Plaintiffs encountered in recommending a remediation plan for the oil laden ground at the site, including the potential use of "multiphase vacuum extraction technology" or a "permeable reactive barrier technology," there is no indication that Plaintiffs were engaged in the development or evaluation of either of these remediation technologies as potential remedies or even that they were in fact new or improved processes of a technologic or scientific nature available to Plaintiffs' industry. For

all that Plaintiffs' description reveals, Plaintiffs utilized existing processes to perform Plaintiffs' work on this project.  Plaintiffs' amended disclosure therefore is an insufficient response to Interrogatory No. 11.

In Plaintiffs' description of Project 31756—General Dynamics—Crab Orchard, Dkt. 99-6 at 13, Plaintiffs assert that Plaintiffs developed a "new process of remediation of soil and groundwater" at an ammunition storage facility.  Dkt. 99-6 at 13.  While Plaintiffs also asserted that in connection with this new remediation process Plaintiffs' developed "a <u>new</u> process of electronically recorded sample collection data in the field during [Plaintiffs'] investigations" of the site, Plaintiffs provided no explanation of why or how such alleged developments represent new technology or a scientific discovery based on any form of experimentation. Accordingly, as stated, this amended response is also an inadequate response to Interrogatory No. 11.

Plaintiffs' amended response regarding Project 31217—Crompton—Powder Tech Lab Closures—Texas is similarly deficient for the simple reason that although Plaintiffs assert that in this project Plaintiffs engaged in developing "relatively new methodologies for remediation of soil and groundwater" at the site, Plaintiffs' interesting descriptions of the actions taken by Plaintiffs fail to describe how or why from a technological or scientific point of view any of the activities in which Plaintiffs engaged on this project represent a new or improved process or methodology.  For example, although Plaintiffs assert Plaintiffs' chemists "<u>worked</u> <u>with</u> an outside lab to develop analytical methods that were acceptable to the [relevant] regulatory agency," Plaintiffs fail to indicate what, if any, of this activity involved new results of

a technologic or scientific nature, nor the nature of any experiment conducted by Plaintiffs in developing the new methodology. Moreover, Plaintiffs fail to explain, even assuming a "new analytical method[ ]" resulted, that such method was Plaintiffs' work product and not that of the stated "outside lab." Plaintiffs' amended response as a response to Interrogatory No. 11 is thus deficient on its face.

Another example of Plaintiffs' deficient responses to Interrogatory No. 11 is Plaintiffs' amended response based on its work on Project 19128—KS Bearings—Masco Corporation. *See* Dkt. 99-6 at 9. Here, Plaintiffs assert their work included "[d]evelopment of <u>new</u> process of source and migration pathway determinations . . . to determine the source and contaminant migration in groundwater," *id.*, in order to refute assertions of the source of such contamination. *Id.* Although Plaintiffs claim there was "uncertainty" as to the "best method of source determination," *id.*, and that Plaintiffs provided a report "convincingly refuting the alleged source of contamination," *id.*, nowhere in Plaintiffs' amended response is there any attempt by Plaintiffs to explain why, from a technological or scientific view, the "process" allegedly used by Plaintiffs on the project was "new," or that its development resulted from experimentation or research of a scientific or technical nature actually conducted by Plaintiffs. Nor, relevantly, does the amended response include the identity of Plaintiff's employees who performed the services described. For this reason, Plaintiffs' response, based on this project, to Interrogatory No. 11 is deficient.

Similarly, as to Project 52778—NASA—Kennedy Space Center, Dkt. 99-6 at 12, Plaintiffs' amended response indicates Plaintiffs experienced uncertainties

whether to use a natural attenuation remedy and "conducted a three-dimensional numerical groundwater flow and contaminant fate/transport modeling" to evaluate the alternative remedies. However, as with Plaintiffs' other amended responses, these descriptions do not include any indicators that Plaintiffs engaged in any scientific or technologic based research to develop or discover such remedies or modeling[10] as new or improved products, processes or techniques for use in Plaintiffs' remediation consulting business. Rather, Plaintiffs' description of Plaintiffs' site investigation, taking of samples, three-dimensional numerical modeling, and systematic testing of alternative remedy designs denotes the use of standard remediation consulting procedures not involving any experimental activity of a research nature by Plaintiffs or even Plaintiffs' development of new technology for evaluating potential remediation schemes. As such, it is deficient.

Plaintiffs' Project 19069—G&H Landfill Year 2 O&M—G&H Landfill Site PRP Group, Dkt. 99-6 at 17, involved Plaintiffs in remediation of contaminants in the client's landfill and especially the cleanup of affected groundwater. According to Plaintiffs' amended response, Plaintiffs considered various optional remediation systems to address the issue including the use of a "geosynthetic clay lines . . . for the landfill cap," but nothing in Plaintiffs' description of its activities on the project indicates Plaintiffs actually developed any new process or products through experimentation involving research based on technology or science including

---

[10]   Although the use of "modeling" may constitute a form of experimentation required for determining that qualified services were performed, *see, supra,* at 5 (referencing 26 C.F.R. § 1.41-4(a)(5)(i)), whether the particular form of modeling utilized by Plaintiffs in this project establishes that all of Plaintiffs' services on this project constituted qualified services is not definitively shown based on the information provided.

"geosynthetic clay lines" and the use thereof for the site. As such, Plaintiffs'

amended response fails to provide Defendant any information regarding Plaintiffs'

performance of any qualified services particularly involving a process of

experimentation as to this project, and, therefore Plaintiffs' amended response is

inadequate as an answer to Interrogatory No. 11.

As to Project 17365—Encore—GM Commercial Program, Dkt. 99-6 at 16,

Plaintiffs' amended response explains this project was "highly challenging" to

Plaintiffs involving "innovative approaches to reduce costs and remediation time."

Plaintiffs also engaged in the "investigation and a systematic process of evaluating

different approaches." As is obvious from a full reading of Plaintiffs' amended

response, however, concerning this project, nothing in Plaintiffs' description of

Plaintiffs' work on this project explains the reasons why such "approaches" were

"innovative" or whether such "approaches" involved some form of technology or

science that Plaintiffs had newly developed or discovered through some form of

experimentation in the course of Plaintiffs' work on the project. Accordingly, this

amended response also fails to fairly respond to Interrogatory No. 11.

Plaintiffs' amended response to Project 30257—GM Tonowanda [*sic*]

Loading Eval., Dkt. 99-6 at 18, describes Plaintiffs' work at another GM facility to

remediate sanitary and storm sewers that contain PCB. In Plaintiffs' amended

response, Plaintiffs claim Plaintiffs developed "a new process of remediation" of the

sewer systems but provide no explanation of why such processes should be

considered as technologically new. Although Plaintiffs advert to a "PCB

encapsulation method," Dkt. 99-6 at 19, Plaintiffs do not state Plaintiffs'

development of this method was the result of scientific research involving a process of experimentation performed by Plaintiffs on this project. Plaintiffs reference to "storm water modeling at the site" and that Plaintiffs employed a "mass loading calculation" does not assert these techniques were new in a technological sense, involve an experimental evaluation of alternative remedies, nor that they were even developed by Plaintiffs in connection with Plaintiffs' work on the project. As such, the amended response fails to reasonably respond to Defendant's Interrogatory No. 11 which requests Plaintiffs identify any qualified services including experimentation performed with respect to this and the other projects in the sample.[11]

Nor can Plaintiffs avoid Plaintiffs' responsibility to respond more fully to Defendant's Interrogatories Nos. 10 and 11 by asserting Plaintiffs may estimate, under the so-called *Cohan* line of cases, the amounts of time in which Plaintiffs' employees were actually engaged in qualified research while working on the 12 projects, as Defendant contends, Dkt. 117 (*passim*). *See* Dkt. 115 at 3. Plaintiffs' reliance on the *Cohan* rule requests an overly broad application of the rule and, as such, Plaintiffs' contention that Plaintiffs may rely on estimates of the time its employees spent in research activities in responding to Defendant's interrogatories, requesting the specifics of the qualified services performed and which of Plaintiffs' employees performed them, is mistaken. First, the holding in the *Cohan* case, *Cohan v. Comm'r*, 39 F.2d 540 (2d Cir. 1930), involving a dispute regarding the famous entertainer and impresario George M. Cohan's business expense deductions, allowed the taxpayer to estimate the amount of such expenses but

---

[11] Plaintiffs' additional responsive material related to only 11 of the 12 sample projects.

permitted the Tax Court on remand in arriving at an estimate of the expenses to "'bear[ ] heavily if it chooses on the taxpayer whose inexactitude is of his own making.'" *Rodman v. Comm'r,* 542 F.2d 845, 853 (2d Cir. 1975) (quoting *Cohan*, 39 F.2d at 544). As relevant, the Second Circuit pointed out that in *Cohan* there was no serious question the alleged expenses were incurred and that the dispute was over the exact amount of these expenses because the taxpayer failed to keep sufficient records of such expenses. *Rodman*, 542 F.2d at 853. However, the Second Circuit in *Rodman*, in affirming the Tax Court's denial of the taxpayer's asserted claim for a deduction in that case, also stated that under the *Cohan* rule, "courts have consistently held that <u>at</u> <u>least</u> <u>the</u> <u>existence</u> <u>of</u> <u>an</u> <u>expense</u> <u>must</u> <u>be</u> <u>proved</u> before any deduction can be taken." *Id.* at 854. *See also Shami*, 741 F.3d at 568-69 (refusing to allow plaintiffs' estimates of time allegedly spent in performing qualified research services to support tax credits under § 41); *Lerch v. Comm'r*, 877 F.2d 624, 628-29 (7th Cir. 1989) (refusing to extend *Cohan* rule where "unsubstantiated deductions are of a sort for which the taxpayer could have and should have maintained the necessary records"); *Akers v. Comm'r*, 326 Fed.Appx. 593, 595-96 (2d Cir. 2009) (citing *Rodman,* 542 F.2d at, 853). Accordingly, the *Cohan* rule does not permit Plaintiffs to estimate the amount of time employees allegedly devoted to qualified research activity in connection with the projects in the absence of evidence that such qualified research activities actually occurred; nor does it permit Plaintiffs to conflate, as does Plaintiffs' opposition to Defendant's motion, any such estimation with Plaintiffs' burden to demonstrate that qualified services underlying Plaintiffs' estimates of related time, were, in fact, performed in

connection with each project.  Because Plaintiffs failed to provide Defendant with specific information to document the actual time Plaintiffs spent in performing qualified services for each project, Plaintiffs' responses to Defendant's Interrogatories Nos. 10 and 11 based on the *Cohan* rule are therefore deficient.

Finally, Plaintiffs' references to documents produced to Defendant to satisfy Interrogatory No. 11 would require Defendant to cull through over 364,000 pages of documents referenced by Plaintiffs to attempt to glean a satisfactory answer.[12]  This also represents an improper document dump and is an additional ground to require Plaintiffs to provide complete answers in accordance with Plaintiffs' burden.  For example, although Plaintiffs insist that the identity of Plaintiffs' employees who performed qualified services on each of the 12 projects based on a comparison of Dkt. 115-3 and Dkt. 115-4, according to Defendant such a comparison yields only five identifiable employees who performed 216 hours of such work on just one such project, 3698, the Cambrex – RI/FS Maybrook Superfund project, despite Plaintiffs' assertion that 86 employees performed 3,823.75 hours of work between June 2001 and December 2002 on the project, in contrast to what is represented in Plaintiffs' Exhibit 4, Dkt. 115-4.  *See* Dkt. 100 at 4-5.  Significantly, Plaintiffs do not respond to Defendant's contention.  *See* Dkt. 115 (*passim*).  Moreover, Plaintiffs' putative inability to identify Plaintiffs' employees who allegedly worked on the projects may be subject to doubt in view of Plaintiffs' familiarity with the project documents, which according to Plaintiffs, "reflect[s] [the] . . . employees who did the work [on the projects]."  *See* Dkt. 99-3 at 21 (Plaintiffs' Third Amended Responses).  As noted,

---

[12]   This figure excludes 454,940 additional pages if Plaintiffs' project documents, CRA 4164 – CRA 459104, are considered.

supra, at 6, Plaintiffs do not contest Defendant's Interrogatories Nos. 10 and 11 request relevant information and that without sufficiently specific responses Defendant will be hampered in Defendant's ability to conduct fact depositions of Plaintiffs' employees or other witnesses to further test whether any of Plaintiffs' work on the projects involved qualified services and the related time Plaintiffs' employees were actually engaged in such services.  Nor do Plaintiffs dispute Plaintiffs bear the burden of establishing Plaintiffs' entitlement to § 41 tax credit as the basis for Plaintiffs' claim.

In short, Defendant is entitled to factually based straightforward answers to Defendant's Interrogatories without being burdened with the need to scrutinize thousands of pages of Plaintiffs' documents in a potentially futile effort to obtain such important information.  Unless greater specificity in Plaintiffs' descriptions of Plaintiffs' work and employee qualified research service time on the 12 sample projects as alleged by Plaintiffs is provided by Plaintiffs, as the court in *Quebe* stated, Defendant will be "prejudice[d]" by forcing . . . [Defendant] to prepare for . . . depositions without essential information . . . [a]nd, if discovery ends without finality in the specific employees' work activities, business components, and uncertainties [Plaintiffs] must identify, summary judgment or trial by ambush could well emerge further prejudicing . . . [Defendant] and further impeding a just, speedy, and inexpensive administration of this case."  *Quebe*, 321 F.R.D. at 311-12.

**CONCLUSION**

Based on the foregoing, Defendant's motion (Dkt. 95) is GRANTED.

Plaintiffs shall provide satisfactory responses to Defendant's Fourth Set

Interrogatories Nos. 10 and 11 <u>within</u> <u>30</u> <u>days</u>.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated: August 22, 2018
Buffalo, New York